Mary C. Geddes
Assistant Federal Defender
FEDERAL PUBLIC DEFENDER
FOR THE DISTRICT OF ALASKA
601 West Fifth Avenue, Suite 800
Anchorage, Alaska  99501
(907) 646-3400

Attorney for Defendant


UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ALASKA

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>        Plaintiff/Respondent,<br><br>vs.<br><br>AARON K. SHARPE,<br><br>        Defendant/Petitioner. | Case No. 3:03-cr-0034-JWS-JDR<br><br>PETITIONER'S BRIEF ON THE MERITS |


I.    <u>BACKGROUND</u>

A.    The Original Case

Aaron Sharpe was charged by indictment with three counts:  for being a felon in possession of a firearm under 18 U.S.C. §§ 922(g)(1) and 924(e)(1); for possession of a firearm during and in relation to a drug trafficking crime, 18 U.S.C. § 924(c)(1)(A)(I); and for cultivation of marijuana under 21 U.S.C. §§ 841(a)(1) and (b)(1)(B).  These charges were based upon evidence located in a space and trailer rented by Mr. Sharpe.

Mr. Sharpe was represented by retained lawyer William Bryson. Mr. Bryson did not file any pretrial motions. Mr. Sharpe went to trial. He did not testify. He was convicted of all counts.

The Presentence Report writer reported that Mr. Sharpe was an Armed Career Offender. No objections were filed by Mr. Bryson. Mr. Sharpe, 31 years old, received concurrent sentences of 188 months for Counts 1 and 2, and 60 consecutive months for Count 3.

Mr. Sharpe appealed. The Ninth Circuit ultimately replaced Mr. Bryson as Mr. Sharpe's appellate counsel after Mr. Bryson failed to either file the opening brief as scheduled or failed to withdraw. Attorney Lance Wells was thereafter appointed to represent Mr. Sharpe on appeal. Mr. Sharpe's convictions were affirmed on June 1, 2005.

Mr. Bryson died on January 10, 2006.

B.    The Habeas Petition

Aaron Sharpe filed a motion to vacate his convictions pursuant to 28 U.S.C. § 2255. The Federal Defender was appointed to represent him. Mr. Sharpe's petition was amended only with respect to Count 3.

Mr. Sharpe asked for discovery or, in the alternative, an evidentiary hearing. The magistrate judge allowed an evidentiary hearing.

C.    The Evidentiary Hearing and Petitioner's Objections

The hearing was held on December 11, 2006, before Magistrate Judge John Roberts. The hearing concerned only one of Mr. Sharpe's claims, i.e., Mr. Bryson's failure to file a motion to suppress based upon an warrantless, unjustified search of Mr. Sharpe's trailer.

Petitioner had nine witnesses, seven of whom testified.  Some proffers by petitioner were accepted in lieu of testimony.  Four of petitioner's witnesses (the two police officers and the two trailer park employees) had testified at Mr. Sharpe's trial as government witnesses.

Petitioner introduced into evidence:  the search warrant related materials (Ex. A); police reports of APD officers Kwasigroch, Glor, Paiz, Jones, and Armstrong (Ex. B); rental-related documents concerning Space No. 186 and trailer at the Rangeview Trailer Park (Ex. C); the retainer agreement between Mr. Bryson, Mr. Sharpe, and Mr. Sharpe's mother, Gwen Brew (Ex. D); photos taken by APD officers prior to obtaining a warrant (Ex. E, F, G, and I); and an excerpt from the cross-examination of Officer Glor at Mr. Sharpe's trial (Ex. H).

The government called no witnesses, and introduced no evidence.

There were three evidentiary issues in the hearing.

First, although the magistrate judge denied Mr. Sharpe's request to have the court accept Robert Herz as an expert witness in criminal defense, the court did not thereafter limit the admissibility of Mr. Herz's testimony, including his opinions.  (Vol. I, Tr. 5, 12, 23, 32, 33, 35; Vol. II, Tr. 12-14, 23-26.).

Second, the magistrate judge declined to take judicial notice of another district court case in which Mr. Bryson was found ineffective.[1]  (Vol. II, Tr. 14-16, 23.) It is the petitioner's position that respondent's counsel opened the door to such evidence by questioning attorney Herz's experience, relative to that of Mr. Bryson.

---

[1]  *See United States v. Hugh M. Powers*, Case No. A97-0119 (HRH) (finding Mr. Bryson ineffective, and granting relief for the petitioner).

Third, police officer Jason Kwasigroch was allowed to utilize his police report as the factual basis for some of his testimony, *rather than his recollection.* In other words, he substituted the content of this record for any recollection (Vol. I, Tr. 199.) The magistrate judge said this would be permitted because petitioner had also sought and obtained admission of the police report (as Exhibit B, Tr. 27). Petitioner's counsel objected to that rationale for admission because the police reports were admitted for a limited purpose, to show what discovery had been received by Mr. Bryson and whether, based on that discovery, a reasonably competent attorney would have filed a motion to suppress. (Tr. 23, 24, 25, 27, 28, 199.) Ordinarily police reports are not admissible under Federal Evidence Rule 803(8).

The hearing ended with oral argument. The government said it would rely upon the inevitable discovery doctrine as the reason why Mr. Bryson's performance was not ineffective. (Vol. II, Tr. 31-33 ("they had the probable cause to get the warrant before they got near the trailer").)

Merit briefing on all issues was permitted by the court.

II.    CLAIMS ONE, TWO, AND FOUR

For each of these three claims, Mr. Sharpe has decided to rely upon the facts and arguments set out in his original petition.

III.    CLAIM FIVE

Mr. Sharpe was sentenced after the decision in *Apprendi v. New Jersey*, 530 U.S. 466 (2000), and before *United States v. Booker,* 543 U.S. 220, 125 S. Ct. 738 (2005). He continues to rely upon the facts and authorities provided in his original petition in arguing that his sentence as an Armed Career Criminal violates the Sixth Amendment, and that Mr. Bryson failed to preserve the issue. Mr. Sharpe alleges the unconstitutionality of a statutorily mandated sentencing enhancement

4

– based upon past criminal history – and as determined by a judge and not a jury under a lesser standard of proof.  Mr. Sharpe asserts that the Supreme Court case of *Dretke v. Haley*, 541 U.S. 386 (2004), and others since, signal the Supreme Court's recognition that *Almendarez-Torres v. United States*, 523 U.S. 224 (1998), involved difficult constitutional questions which should be reconsidered in the Sixth Amendment context.

IV.   CLAIM THREE

    A.    Introduction

Mr. Sharpe has sought to vacate his convictions under 28 U.S.C. § 2255 on the ground that he was denied his right to the effective assistance of counsel as guaranteed by the Sixth Amendment.[2]  He complains that his lawyer, William Bryson, failed to file a motion to suppress evidence obtained in violation of his rights under the Fourth Amendment.[3]

    B.    The Showing Required By *Strickland*

Under *Strickland v. Washington*, 466 U.S. 668, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984), Mr. Sharpe must demonstrate that his counsel's omission was not well within the range of professionally reasonable judgments.  He must also show that the omission created a reasonable

---

[2]  The Sixth Amendment provides:

In all criminal prosecutions, the accused shall enjoy the right to a speedy and public trial, by an impartial jury of the State and district wherein the crime shall have been committed, which district shall have been previously ascertained by law, and to be informed of the nature and cause of the accusation; to be confronted with the witnesses against him; to have compulsory process for obtaining witnesses in his favor, and to have the Assistance of Counsel for his defence.

[3]  The Fourth Amendment to the United States Constitution provides:

The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, . . . .

probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different.   A reasonable probability is a probability sufficient to undermine confidence in the outcome.

      C.      <u>Summary of IAC Claim</u>

      In this case, Aaron Sharpe's retained lawyer, William Bryson, failed to file a motion to suppress evidence obtained by the police in an illegal warrantless search conducted on January 10, 2003.   The retainer agreement between Mr. Bryson, Mr. Sharpe, and his mother covered the filing of any pretrial motions.   There was no evidence of any strategical reason, or advantage gained, for the failure to file a pretrial motion.

      Mr. Sharpe asserts that the police obtained constitutionally-unauthorized views of and smells emanating from the interior of Mr Sharpe's rental trailer.   The police entered the trailer, made observations, took photographs, and seized a shotgun, prior to obtaining any warrant.   Thereafter, the police sought a warrant, utilizing the illegally obtained information, to search for evidence of "misconduct involving a controlled substance, any degree."

      Suppression would have been ordered because:   the tenant did not consent to any entry or view by anyone; there was no exigency allowing for the warrantless, unconsented view and entry by the police; there was no exigency allowing for the seizure of the shotgun inside the home prior to obtaining any warrant; and, probable cause for the later issuance of the search warrant was expressly premised upon the APD officer's unauthorized seizure of the weapon and search.   If granted, a pretrial motion to suppress the fruits of this search would have been dispositive of the case, because the government could not proceed without the suppressed evidence, which included the gun.

D.     Based On the Discovery Received, Counsel Should Have Moved to Suppress

Mr. Bryson's pretrial representation was inadequate because:  he received discovery that would have alerted him to an initial warrantless search lacking in exigency; he did not file a motion to suppress; and, there was no tactical or strategical reason he did not file.  This conclusion is supported by the following, which were established in the evidentiary hearing.

- Mr. Bryson was retained by Mr. Sharpe's mother to represent him in his felony district court case.  The retainer agreement (Ex. D) showed that there was no limitation on Mr. Bryson's representation, that a trial was anticipated, and that Mr. Bryson was expected to litigate pretrial motions.

- The government discovery provided to Mr. Bryson included:

  - Police reports and photographs concerning their response to Arthur Chognacki and the trailer at 705 Muldoon, Space 186 (Ex. B, F and G).

  - The search warrant application and supporting affidavit, and the signed authorization by a state district court magistrate (Ex. A).

  - A packet of documents from the Rangeview Trailer Park, which included the rental agreements for Space 186 and the trailer in it (Ex. C, and Vol. I, Tr. 83).

- A review of the trailer park documents indicated that the landlord was required to give reasonable advance notice of any entry, except for fire and safety emergencies.

- A review of the trailer park documents indicated that the resident was required to maintain an outside shut-off valve for utilities, including water (*see also* Vol. I, Tr. 112).

- A review of the police documents indicated that the trailer park manager became aware of a water leak about 10:00 a.m, determined the tenant was not at home, could not reach the tenant through his emergency contact numbers, and decided to enter the home for the purpose of investigating and stopping the leak.

- A review of the police documents showed that the manager/plumber resolved the leak by using the shut-off valve located outside the trailer.

- A review of the police documents showed the police were specifically aware the tenant was not at home and that the manager had used a locksmith to obtain entry into the trailer.

7

- A review of the police documents indicated that both the manager and the police entered the trailer prior to the grant of a search warrant.

- A review of the affidavit provided in the support of the search warrant application indicated that probable cause was based upon the police officer's observations through the open door of the trailer and through entry.

- A review of the police reports and the affidavit indicated that the shotgun had been seized prior to the grant of a search warrant.

Given that this case involved an initial warrantless and unconsented view and entry by the police into a trailer rented by Aaron Sharpe, and that the probable cause for the search warrant was based the observations of the police officers during such view and entry, reasonably competent representation by an attorney would involve a review of these documents, an investigation of the scene and contact with witnesses, the filing of a motion to suppress, and the request for an evidentiary hearing.

This is because the Fourth Amendment protects "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." The warrantless entry of a person's house is unreasonable per se in the absence of consent; furthermore, probable cause alone will not support a warrantless search or arrest in a residence unless some exception to the warrant requirement is also present. *See Payton v. New York*, 445 U.S. 573, 586, 590, 100 S. Ct. 1371, 63 L. Ed. 2d 639 (1980), and *United States v. Salvador*, 740 F.2d 752, 758 (9th Cir. 1984), *cert. denied*, 469 U.S. 1196, 105 S. Ct. 978, 83 L. Ed. 2d 980 (1985), *cited in United States v. Al-Azzawy*, 784 F.2d 890 (9th Cir. 1985).

Furthermore, "the exclusionary rule prohibits introduction into evidence of tangible materials seized during an unlawful search," and "of testimony concerning knowledge acquired during an unlawful search." *Murray v. United States*, 487 U.S. 533, 536- 37 (1988) (citations

8

omitted).  The exclusionary rule also prohibits the introduction of derivative evidence that is the product of the primary evidence.  *See Wong Sun v. United States*, 371 U.S. 471, 484-85, 83 S. Ct. 407, 415-16, 9 L. Ed. 2d 441 (1963).

While counsel for Mr. Sharpe could have and should have anticipated the government would defend against a motion to suppress, e.g., on the grounds of exigency and inevitable discovery,[4] it would be the government's burden to demonstrate that the search was lawful.  *See*, e.g., *United States v. Davis*, 332 F.3d 1163, 1168 (9th Cir. 2003).  If the government failed to carry its burden, the motion would be granted, and the case against Mr. Sharpe dismissed.

Defense counsel Robert Herz, who had reviewed the same documents provided in discovery to Mr. Bryson, could think of no plausible reason why a motion to suppress had not been filed in this warrantless search case.  His review of Mr. Bryson's files found nothing that indicated Mr. Bryson had researched case law, investigated the facts, or considered filing a motion.[5]

E.    The Government's Response:  Inevitable Discovery Trumps

The government's defense to Mr. Sharpe's IAC claim is simply this:  if a motion to suppress had been filed, it would not have prevailed.  The government thus urges this court to proceed directly to the second prong of *Strickland,* which evaluates the impact of any attorney error

---

[4]  From the discovery, it was already obvious that "consent" clearly did not authorize entry here; it is a matter of longstanding Supreme Court jurisprudence that a landlord cannot consent to the police search of a tenant's home.  *Chapman v. United States*, 365 U.S. 610, 81 S. Ct. 776, 5 L. Ed. 2d 828 (1961).

[5]  The court accepted a proffer that Lance Wells, Mr. Sharpe's appellate attorney, had also reviewed the files and found no indication that Mr. Bryson had considered the pretrial search/suppression issues.  (Vol. I, Tr. 75-77.)

on the outcome of the case.  In making this argument, the government has not disagreed that the

motion to suppress would have been dispositive, simply that it would not have been granted.

    F.    <u>There Are No Exceptions to the Search Warrant Requirement or the Exclusionary Rule That Save This Search</u>

        1.    <u>The inevitable discovery exception does not save this warrantless search</u>

The government has cited and relies upon the holdings of *Nix v. Williams*, 467 U.S.

431, 440-44, 104 S. Ct. 2501, 81 L. Ed. 2d 377 (1984), *United States v. Andrade,* 784 F.2d 1241 (9th

Cir. 1986),[6] and *United States v. Reilly*, 224 F.3d 986 (9th Cir. 2000), for its argument that the

inevitable discovery exception to the exclusionary rule saves the bad search in this case.[7]

---

[6] In his closing, Mr. Randell mistakenly referred to the title of this case as *"Androtti,"* but provided the correct cite.  (Vol. II, Tr. 22.)

[7] The pertinent circumstances in *Nix* and *Andrade* are easily distinguishable and the *Reilly* case supports the petitioner's position.

*Nix v. Williams* concerned the "Christian burial speech" defendant who had given information as to the location of his victim's body.  At the time Williams made his statements, his car had already been located, the car contained some of the victim's clothing, and searchers were in the vicinity.  The initial case decision (*Brewer v. Williams*, 430 U.S. 387, 97 S. Ct. 1232, 51 L. Ed. 2d 424 (1977)), held that these statements from Williams were obtained in violation of his right to counsel.  His conviction was reversed and the case remanded for re-trial.  However, the holding suggested an exception, in the making, to the exclusionary rule; the court indicated that evidence of the body's location and condition "might well be admissible on the theory that the body would have been discovered in any event, even had incriminating statements not been elicited from Williams." *Id.* at 407 n.12, 97 S. Ct. at 1243 n.12.

On remand for a second trial, the state proved by a preponderance of the evidence that, if the search had not been suspended and Williams had not led the police to the victim, her body would have been discovered "within a short time" in essentially the same condition as it was actually found.  The trial court also ruled that if the police had not located the body, "the search would clearly have been taken up again where it left off, given the extreme circumstances of this case and the body would [have] been found in short order."  In finding that the body would have been discovered in essentially the same condition as it was actually found, the court noted that freezing temperatures had prevailed and tissue deterioration would have been suspended.  *Id.* at 87.  The challenged evidence was admitted and the jury again found Williams guilty.  467 U.S. at 437.

The defendant in *Andrade* was arrested outside a hotel by King County police who were working with the Drug Enforcement Agency (DEA).  He had been carrying a garment bag which was on the ground by his feet at the time of arrest.  The county officers did not search the bag immediately, but waited for drug detection dogs.  The dog search, about an hour after the arrest, did

10

> The inevitable discovery doctrine acts as an exception to the exclusionary rule, however, and permits the admission of otherwise excluded evidence "if the government can prove that the evidence would have been obtained inevitably and, therefore, would have been admitted regardless of any overreaching by the police . . . ." *Nix*, 467 U.S. at 447, 104 S. Ct. 2501. The government must make this showing by a preponderance of the evidence. *See id*. at 444, 104 S. Ct. 2501.

*United States v. Reilly*, 224 F.3d at 994.

Counsel for the respondent contends that the inevitable discovery doctrine saves the search *because* the police had probable cause once they were informed by the manager of his discovery. This argument does not track the law of inevitable discovery, specifically the burdens placed on the government, and the *Reilly* case is most instructive in this regard. Probable cause alone will not support a warrantless search or arrest in a residence absent a sufficient showing of an exception. *See Payton v. New York*, 445 U.S. 573, 586, 590, 100 S. Ct. 1371, 63 L. Ed. 2d 639 (1980), *citing Johnson v. United States*, 333 U.S. 10, 13-14, 68 S. Ct. 367, 369, 92 L. Ed. 436 (1948) ("Any assumption that evidence sufficient to support a magistrate's disinterested determination to issue a search warrant will justify the officers in making a search without a warrant would reduce the Amendment to a nullity and leave the people's homes secure only in the discretion of police officers.").

*Reilly* involved the circuit's refusal to apply the evitable discovery exception to the Fourth Amendment requirement for a warrant based on probable cause. After his arrest, and in

---

not alert the police to any contraband. Nevertheless, an officer then searched the bag and discovered a package of cocaine. The cocaine was not seized, but was returned to the bag. Andrade was taken to a nearby DEA holding facility at Sea-Tac airport. At the DEA facility, he was booked, the bag was searched, and agent Loveless found the cocaine as part of a routine inventory procedure.

Andrade did not challenge his arrest, but contended the cocaine found in his garment bag be suppressed because the one hour delay between the arrest and the search made the search unlawful. The courts determined that the government carried its burden in establishing the routine procedures to be followed after an arrest included the search and inventory of all property at a DEA facility.

response to questioning, Reilly had asked for an attorney, but the police improperly persisted and obtained Reilly's consent to search his hotel room. The consent was invalid, but the district court applied the inevitable discovery exception to the fruits of the search. The district court had thought that, because the officers had probable cause for a search warrant and would have applied for a search warrant in the absence of a consent, inevitable discovery would save the fruits of the search. While the reviewing court agreed that, factually, the FBI in this case had sufficient probable cause to obtain a warrant and, legally, the government may justify a warrantless search by showing that the evidence would have been uncovered by officers in carrying out routine procedure, the appellate court disagreed with the district court's conclusion. The appellate court held that the inevitable discovery doctrine could not be applied in Reilly's case to excuse the officers' misconduct in failing to present the probable cause that did exist to a magistrate and obtain a warrant. The *Reilly* decision reiterated the reasoning of an earlier case, *United States v. Echegoyen*, 799 F.2d 1271, 1280 n.7 (9th Cir. 1986), that "to excuse the failure to obtain a warrant merely because the officers had probable cause and could have inevitably obtained a warrant would completely obviate the warrant requirement of the Fourth Amendment."

Mr. Sharpe's case is a little different on its facts, but *Reilly* is still on point. In Mr. Sharpe's case, the probable cause which was presented to the magistrate rested on the officer's background knowledge (Ex. A, Affidavit, ¶¶ 2, 5, 6, 7) (e.g., "I have experienced the smell of green growing marijuana while dissembling marijuana grows") and the details of his own observations (e.g., ¶ 10, "I . . . could smell a strong odor of green marijuana coming from the open door to the trailer"). While there certainly had been an opportunity for the police to obtain a search warrant based upon *untainted* probable cause, i.e., through a detailed recounting of the manager's basis of

knowledge and observations, the police did not exercise that opportunity nor was there any evidence that they planned to do that. There certainly was no evidence presented in this hearing that established that the police were pursuing an alternative or independent line of investigation (such as the search effort in *Nix*).

*Reilly* instructs that, even when the police could have presented sufficient facts untainted by an illegal search to a magistrate but failed to do so, the inevitable discovery exception will not be applied.

2.     There was no exigency which justified the search or seizure of the gun.

a.     *Background*

As described in the testimony of property manager Chognacki (Vol. I, Tr. 79-20) and former trailer park maintenance supervisor Krystof ("Chris") Osesik (Vol. I, Tr. 166-80), the manager and his maintenance crew were concerned because there was water visibly leaking from the floor of the trailer in rental space 186. (Tr. 82.)

Each rental trailer had an outside "turnoff" for the water going into it. (Tr. 112-13.) Individual shut-off valves for different appliances and sinks were located inside the trailer, but the main shut-off valve would shut off all of the water going into the trailer, and without affecting the operation of the trailer's heating unit. (Tr. 112-13.) This underground valve, for which a special key was required (Tr. 118-99) was located outside the trailer. (Tr. 112.) According to Chognacki, it is of no use to shut off the individual valves inside if there is still "main water coming in." (Tr. 119.)

Chognacki decided that "somebody need[ed] to open the door."[8]   (Tr. 168.) Chognacki said he wanted to "see what is the problem" (Tr. 120.)  His plumber had already told him there was damage.  (Tr. 113.)  Because it was a rental unit, he wanted "to deal with it."  (Tr. 86.)  If damage resulted from a plumbing problem caused by the tenant, and the trailer park can prove it, then the tenant would be financially responsible.  (Tr. 115.)  Chognacki "just wanted to see what was the problem, where the leak is coming from,"  (Tr. 120.)

The men determined that no one was home in Mr. Sharpe's trailer.  (Tr. 86.)  There was no car in the driveway.  (Vol. I, Tr. 89, 166.)  The men had knocked on windows, doors, and all along the sides of the metal trailer (Vol. I, Tr. 85-86, 89-90, 166, 178, 179), for several minutes. (Tr. 166.)  They had gotten no response.  (Vol. I, Tr. 166.)  They had gotten no response to crawling underneath the trailer to look at the pipes.  (Tr. 90.)  Ultimately, the manager decided to have a locksmith, who was already at the trailer park on another job (Vol. I, Tr. 84), unlock the door in order to gain entry.  (Tr. 84, 168.)

Only when the door was unlocked and opened could the men smell marijuana. (Vol. I, Tr. 92, 168.)

Inside the trailer, the men saw a plastic lining was had been hung between the kitchen and the rest of the trailer.  (Vol. I, Tr. 169.)  When the manager unzipped the barrier, he observed a forest of plants.  (Tr. 94, 95.)  The manager decided that they should back out and call the police. (Tr. 95-96.)  The men closed the trailer door behind them (Tr. 95- 96, 171, 232), on this January day.

---

[8]  Osesik, the maintenance supervisor, testified that he does not know why it was necessary to shut off the water then, but "[t]he water was running for a while and usually in this scenario the main valve needs to be shut off to prevent the water from entering the street."  (Vol. I , Tr. 177.)

The plumber used the water shut-off valve located outside the trailer to stop the flow of water and the leak.  (Tr. 178.)

The men stayed at the front of the trailer, at the bottom of the steps to the entrance, waiting for the police.  (Ex. F and Vol. I, Tr. 95-97, 170-71, 172.)  The police came "pretty quickly" within a half-hour.  (Tr. 98.)

The police arrived and spoke to Chognacki.  (Tr. 173.)  Chognacki told the police that there had been a water break, that no one was home, that they had not been able to reach the tenant, that they had been unable to unlock the door, and that they had a locksmith open it.  (Tr. 100.)  The manager told them what he had seen inside the trailer.  (Tr. 100.)

Osesik testified that, after the police  spoke with Chognacki, they walked around the outside of the trailer, and then opened the door.  (Tr. 173.)  Osesik was within five feet of the officers.  (Tr. 174)  Based on what he observed, Osesik believed the officers did not go far into the interior of the trailer at this time.  He saw a police officer "grab" the shotgun from inside the trailer, and then the police officer "stepped out [sic] and I think he got on the radio."  (Tr. 174.)

Chognacki recalled that he told the officers they could go inside.  (Tr. 101.)  He offered to show the police the inside of the trailer.  (Tr. 100.)  Chognacki remembered that the police initially told him that they could not go in.  (Tr. 100, 101.)

In this proceeding, Chognacki said he could not remember if he opened the door for the police (Tr. 101, nor could he remember  if the police took a look through the open door (Tr. 101). This failure of memory on Chognacki's part was recent.  Prior to the hearing,  Chognacki had told Bruce Johnson and Mary Geddes that "he asked [the police] if they wanted to take a look and they said yes, and he opened the door and showed them the inside but they didn't go in."  (Tr. 232.)

15

Chognacki thought the police had only gone in after they got a search warrant. (Tr. 117) He remembered he had to wait at the door of the trailer while they yelled "Anchorage Police." He testified that, after that did that, he was allowed in. He went in to "look at the place, what kind of damage is inside." (Tr. 117) He said that the police "went through the whole place and started looking." He also said the water was not running at that time. (Tr. 118)

In his affidavit, Officer Kwasigroch said that he initially entered the trailer in order to "assist" the plumber and *to protect the evidence that he had already seen*. (Ex. A) Officer Kwasigroch's affidavit (in Ex. A) makes reference to an "open door," but does not recount how it came to be opened.[9] According to the affidavit, because of the open door, Kwasigroch could smell marijuana and look into the trailer before he entered.

Officer Glor remembered a different reason for their initial entry. He said that the police had first entered because "we had a concern for the residents ourselves . . . that someone might be inside . . . and there was reported to be a weapon inside as well" (Tr. 136). Officer Glor, however, also conceded that <u>none</u> of the trailer park employees had indicated a belief that the trailer was occupied. (Tr. 137-138)

Although officers testified that their warrantless entries were for other purposes , the hearing established that the seizure of the shotgun preceded the warrant and that, after their initial

---

[9] Officer Kwasigroch's failure to clarify how the "open door" of the trailer came to be open was an omission from his affidavit which, if not false, evinced a reckless disregard for the truth because the affidavit as written suggested to the magistrate that the smell and view was legally obtained. The evidence adduced at the evidentiary hearing indicated that the door was either opened by the landlord for the purpose of showing the police officers what was inside or opened by a police officer. .

warrantless search and seizure of the gun, the police officers had remained inside the trailer for some unknown amount of time and took photographs of the interior. (Vol. II, Tr. 2)(Ex. I).

Although a more detailed chronology was lacking, the record established that the officers had arrived at approximately 12:45 p.m. and did not obtain a search warrant until 4:05 p.m. (Ex. A) despite the proximity of the courthouse (approximately a drive of ten minutes).

b.    *Discussion*

"[W]arrants are generally required to search a person's home or his person unless 'the exigencies of the situation' make the needs of law enforcement so compelling that the warrantless search is objectively reasonable under the Fourth Amendment." *Mincey v. Arizona*, 437 U.S. 385, 393-94, 98 S. Ct. 2408, 57 L. Ed. 2d 290 (1978).

It is a "heavy burden" that the government bears when trying to prove exigent circumstances. *See United States v. Howard*, 828 F.2d 552, 555 (9th Cir. 1987) *citing United States v. Licata*, 761 F.2d 537, 543 (9th Cir. 1985). To prove that exigent circumstances existed, the government cannot rely on "speculation about what may or might have happened." *See Howard*, 828 F.2d at 555. Instead, it must point to "specific and articulable facts which, taken together with rational inferences . . ., support the warrantless intrusion." *Id.*

There was no exigency here which, viewed objectively, compelled any immediate entry. The water got shut off from outside. Nothing required the police to allow the plumber or the manager back into the trailer, just so that he could get on with it, i.e. surveying any damage. In fact, the record did not reflect that there was even such a demand from the trailer park management. This was not an objectively reasonable excuse for the police to immediately enter without a warrant. *See Brigham City, Utah v. Stuart*, ___ U.S. ___, ___, 126 S. Ct. 1943, 1948, 164 L. Ed. 2d 650 (2006).

Because no one was inside the trailer, there was no threat of immediate injury. While in some circumstances a water leak might create an immediate physical hazard, ( e.g., on the second floor of a building where an extensive leak could create a danger those on the first floor), there was no such hazard created here. No one was injured or sick inside, nor was there someone outside who required prescription medicine or other essential items located inside the trailer. Even if Officer Glor subjectively feared a possibility that someone might be home, and therefore would have access to the shotgun inside, an objective standard of reasonableness applies here. *See Brigham City, Utah v. Stuart*, ___ U.S. ___, ___, 126 S. Ct. 1943, 1948, 164 L. Ed. 2d 650 (2006). There was no information in this case which suggested that anyone was at home; indeed all indications were to the contrary.

Furthermore, since no one was inside, the destruction of the evidence was not a threat. While one officer sought a warrant, others could remain in the immediate vicinity of the trailer and contact anyone attempting to enter the trailer. Evidence would be preserved by denying access for the short amount of time required to obtain a warrant.[10]

A warrantless entry by criminal law enforcement officials may only be legal as an exigency when there is a compelling need for official action and no time to secure a warrant. *See Michigan v. Tyler*, 436 U.S. 499, 509 , 98 S. Ct. 1942, 1950 (1978), *citing Warden v. Hayden*, 387 U.S. 294, 87 S. Ct. 1642, 18 L. Ed. 2d 782 (warrantless entry of house by police in hot pursuit of armed robber). Exigent circumstances are present when "a reasonable person [would] believe that entry . . . was necessary to prevent physical harm to the officers or other persons, the destruction of

---

[10] According to Officer Kwasigroch, the courthouse and the magistrates' office which issued the search warrants was a ten-minute drive away. (Vol. I, Tr. 207)

relevant evidence, the escape of the suspect, or some other consequence improperly frustrating legitimate law enforcement efforts." *United States v. McConney*, 728 F.2d 1195, 1199 (9th Cir.) (*en banc*), *cert. denied*, 469 U.S. 824, 105 S. Ct. 101, 83 L. Ed. 2d 46 (1984).

There was no exigency present here which justified a warrantless entry and seizure of evidence.

3.     <u>There was no plain view (or smell) which was legally obtained</u>

The probable cause statement in the affidavit supporting the issuance of the search warrant included Officer Kwasigroch's observation that he smelled marijuana through the trailer's open door, and was able to see the interior of the trailer from the outside the open door.

Application of the plain view doctrine is limited to those situations in which the officer had a legal right to be at the location from which object was plainly viewed.  When an officer observes an object left by its owner in plain view, no search occurs because the owner has exhibited "no intention to keep [the object] to himself."  *Katz v. United States*, 389 U.S. 347, 361, 88 S. Ct. 507, 19 L. Ed. 2d 576 (1967) (Harlan, J., concurring).  The burden is on the government to prove that any departure from the warrant requirement was justified.  *United States v. Gardner*, 627 F.2d 906, 909, 919 (9th Cir. 1980); *Schneckloth v. Bustamonte*, 412 U.S. 218, 219, 93 S. Ct. 2041, 2043, 36 L. Ed. 2d 854 (1973).  *See*, e,.g., *United States v. Martin*, 693 F.2d 77, 78 (9th Cir. 1982).

Obviously, in this case, the renter of the trailer had every intention to maintain his privacy, going so far as to change his door lock which prevented access by the trailer park management.  He did not consent to the opening of the trailer door for the purpose of any inspection by the police.

Furthermore, the lease agreement indicates that the entry of the landlord was unauthorized, because the manager's desire to expeditiously view any damage inside his rental property caused by a water leak was not an "emergency safety inspection."

Even assuming *arguendo* that the manager himself had limited authority under the lease to make this entry, he certainly had no authority to allow the police to enter, or to facilitate their view of the interior through an opened door.  It is a matter of well-established federal constitutional law that a warrantless search of rented premises, in absence of the tenant but with the consent of the manager, is unlawful, and the fruits of the search are inadmissible.  *Chapman v. United States*, 365 U.S. 610, 614, 81 S. Ct. 776 (1961).  *See also Taylor v. United States*, 286 U.S. 1, 52 S. Ct. 466, 76 L. Ed. 951 (1932), and *Johnson v. United States*, 333 U.S. 10, 68 S. Ct. 367, 92 L. Ed. 436 (1948). *See also United States v. Warner*, 843 F.2d 401 (9th Cir. 1988) (even if landlord could enter to make repairs, he could not consent to police search).  Therefore, a manager's permission - or accommodation - that the police can smell or look through a door that he has opened cannot lead to admissible evidence.

In this case, there were no facts that could have informed the officers that they had the consent of the tenant to be on the premises.  Furthermore, there were no facts that suggested they had a plain view of the evidence from an otherwise authorized position.  From Chognacki, Officer Kwasigroch learned that his entry of the closed, locked door had been forced by a locksmith.

Officer Kwasigroch's recollection as to an "open door," the smell as he approached the trailer, and the view he obtained before and without making any entry was lacking in any meaningful details, was completely uncorroborated by the account of his fellow officer, and was wholly contradicted by the two witnesses, who had shut the door behind them. It was undermined

20

in credibility by his initial testimony that he "had to go with," and rely "entirely" upon his report rather than the accuracy of his recollection. (Tr. 1820183) Kwasigroch testified that he could not remember most of the details of that day. (Id.) . Moreover, since Officer Kwasigroch acknowledged that Officer Glor might have arrived first on the scene, not even Kwasigroch's testimony credibly established that his view was a wholly inadvertent one afforded to the police.

Officer Glor could not recall if he had smelled marijuana outside the trailer, (Tr. 142) if the door had been standing open at the time of his arrival (Tr. 196) nor when he approached the trailer. (Tr. 140) He had no recollection of pausing and looking through an open door. (Tr. 146)

Osesik remembered that the trailer park employees had closed the door of the trailer. He saw the police open the closed door (Tr.173) and briefly go inside, retrieving the gun. (Tr. 174.) Osesik had a "not bad" recollection of what had happened. (Tr. 175.)

Chognacki was also sure that the door was closed. He told the officers they could go inside. (Tr. 101.) He offered to show the police the inside of the trailer. (Tr. 100.) Chognacki remembered that the police said they could not go in, and they did not actually go in at that time. (Tr. 100, 101.) In this proceeding, Chognacki said he could not remember if the police took a look through the open door (Tr. 101), nor could he remember if he opened the door for them. (Tr. 101.) Chognacki had told Bruce Johnson and Mary Geddes that "he asked [the police] if they wanted to take a look and they said yes, and he opened the door and showed them the inside. (Tr. 232.)

Based on the foregoing, this court can only conclude that any smell/view of the trailer's interior was not "plain." The government had the burden as a matter of law under *Coolidge v. New Hampshire*, 403 U.S. 443, 91 S. Ct. 2022, 29 L. Ed. 2d 564 (1971), but did not carry it here.

There was evidence that the smell/view was obtained either because a police officer opened the door or because the manager opened the door to accommodate the initial police view/entry.

      G.     The Untainted Evidence Does Not Establish Probable Cause

          Since the shotgun had been seized prior to obtaining any warrant, and all of Officer Kwasigroch's sworn observations of the evidence at the trailer were illegally obtained, those observations must be stricken from the affidavit in support of the search warrant application. "[E]vidence which is obtained as a direct result of an illegal search and seizure may not be used to establish probable cause for a subsequent search." *United States v. Wanless*, 882 F.2d 1459, 1465 (9th Cir. 1989) (citations omitted). When an affidavit contains evidence illegally obtained, "[a] reviewing court should excise the tainted evidence and determine whether the remaining, untainted evidence would provide a neutral magistrate with probable cause to issue a warrant." *United States v. Vasey*, 834 F.2d 782, 788 (9th Cir. 1987) (citation omitted).

          What's left, what's untainted, does not amount to probable cause. Assuming, then, Officer Kwasigroch's own observations are stricken from the affidavit, what remains is the following at ¶ 9.

> Upon my arrival with OFFICER GLOR we met with CHOGNACKI and a plumber. CHOGNACKI stated he had received a phone call from another renter, that there was water leaking from space 186. CHOGNACKI attempted contact with the renter of space 186, RON HARP 08-05-1972, but was unsuccessful. CHOGNACKI then called his lawyer and was advised he could make emergency entry. CHOGNACKI then called a locksmith, as the locks had been changed without permission, and a plumber. The locksmith arrived and unlocked the door. CHOGNACKI stated at that point he could smell and see marijuana. CHOGNACKI then called APD.

The question is whether the statement attributed to Chognacki, e.g., that when the door was unlocked, he could smell and see marijuana, can alone establish probable cause. The answer has to be no.

According to Officer Kwasigroch's sworn statements in the affidavit, at ¶ 3, he is an expert in the interviewing of witnesses, and has experience in applying for search warrants. Nevertheless, the officer's accounting of Mr. Chognacki's observations to him is wholly lacking in the kind of detail which would make such account, and such informant, credible and reliable. A mere summary statement of belief is insufficient. An affidavit must provide the magistrate with a *substantial basis for determining the existence of probable cause. See Nathanson v. United States*, 290 U.S. 41, 47 (1933) ("[a judicial] officer may not properly issue a warrant to search a private dwelling unless he can find probable cause therefor from facts or circumstances presented to him under oath or affirmation. Mere affirmance of belief or suspicion is not enough."). The statement seemed insufficient in *Nathanson* – that the police had received reliable information from a credible person and believe that heroin is stored in a home – is really not much different that what remains in this affidavit after the tainted information is redacted.

While the affidavit identifies Chognacki by name, and position ("manager/owner") and his first-hand observation as reported to Kwasigroch (after the door was unlocked, "he could smell and see marijuana"), there is not even the briefest of explanations as to how Chognacki could identify the smell and sight of a controlled substance. When considering the basis of knowledge, courts look for "how the informant came by his or her knowledge." *United States v. Angulo-Lopez*, 791 F.2d 1394, 1396 (9th Cir. 1986). This requirement does not just refer to first-hand knowledge; in the matter of controlled substances, the ability to identify illicit substances by smell and sight is

almost always explained by way of background information about the source. In this affidavit, for example, Officer Kwasigroch provided the magistrate with lots of information as to how he came by his knowledge of marijuana and marijuana grows: the length of his tenure as a police officer, ¶ 2; his "formal training in the detection and identification of controlled substances," ¶ 7; his experience with "the smell of green growing marijuana while dissembling marijuana grows" and of "smoked marijuana" and paraphernalia in the course of his duties as a police officer, ¶ 6.

Not only would a reviewing officer be uninformed how Chognacki concluded marijuana was involved, the officer would have had no description or details which would help him evaluate the veracity of the report, e.g., where the reported marijuana was located in the trailer, what it looked like (color, size, form, quantity), or whether there were other items present which might corroborate use, cultivation or distribution.[11]

The lack of detail provided by the affiant for informant Chognacki's report of marijuana, and lack of corroboration, fails to establish probable cause under the totality of circumstances test articulated in *Illinois v. Gates*, 462 U.S. 213, 238, 103 S. Ct. 2317, 76 L. Ed. 2d

---

[11] This detail would be particularly important to an Alaska state court magistrate who would have been informed by *Ravin v. State*, 537 P.2d 494 (Alaska 1975), that the "citizens of the State of Alaska have a basic right to privacy in their homes under Alaska's constitution. This right to privacy would encompass the possession and ingestion of substances such as marijuana in a purely personal, non-commercial context in the home." Since the time of Mr. Sharpe's conviction, the Alaska Court of Appeals has expressly held that a magistrate should not issue a warrant to search someone's home for evidence of marijuana possession unless the search warrant application establishes probable cause to believe that the marijuana possession falls outside the scope of protected personal use identified in *Ravin*. *State v. Crocker*, 97 P.3d 93, 97-98 (Alaska App.2004).

527 (1983).[12]  *Compare, United States v. Celestine, supra*, 324 F.3d at 1109 (9th Cir. 2003) (citation omitted).

    H.    <u>Conclusion</u>

    Mr. Sharpe has established that Mr. Bryson was in receipt of discovery, prior to the pretrial motions deadline, from which a competent attorney would have determined that there were Fourth Amendment questions to be investigated[13] and litigated.[14]    Where the seizure of the shotgun was unauthorized by warrant or by any exception to the warrant requirement, where the subsequent search warrant affidavit was almost entirely predicated on an earlier unlawful search, and where probable cause is lacking with respect to the untainted information remaining in a redacted search warrant, grounds for suppression existed.

    Mr. Sharpe has made a sufficient showing under both prongs of *Strickland*.  First, he has shown that his counsel has made errors so serious that he "was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment."  466 U.S. at 687-88.  Second, Mr. Sharpe has

---

   [12] Although *Gates* discarded the "two-pronged" approach established by *Aguilar v. Texas*, 378 U.S. 108, 84 S. Ct. 1509, 12 L. Ed. 2d 723 (1964), and *Spinelli v. United States*, 393 U.S. 410, 89 S. Ct. 584, 21 L. Ed. 2d 637 (1969), the factors "considered critical" under those cases – an informant's veracity, reliability, and basis of knowledge – remain "highly relevant" to the inquiry. *United States. v. Morales*, 252 F.3d 1070, 1074 (9th Cir. 2001).

   [13] Through Mr. Herz's testimony, the petitioner established that the Fourth Amendment is typically the first line of defense in "grow" cases, and that the failure to investigate such a defense was a gross deviation from prevailing professional norms and unreasonable.  The adversarial "testing process" generally will not function properly unless defense counsel has done some investigation into the prosecution's case and into various defense strategies.  *Kimmelman v. Morrison,* 477 U.S. 365, 374, 106 S. Ct. 2574 (1986), *citing Strickland*.

   [14] In making the competency determination under *Strickland v. Washington*, 466 U.S. 668, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984)*,* a reviewing court "should keep in mind that counsel's function, as elaborated in prevailing professional norms, is to make the adversarial testing process work in the particular case."  *Id.* at 690.

shown that there is "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id.* at 694. "A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.*

Mr. Sharpe therefore asks this court to grant his application and vacate his convictions.

DATED this 22nd day of January, 2007.

Respectfully submitted,

FEDERAL PUBLIC DEFENDER
FOR THE DISTRICT OF ALASKA

/s/ Mary C. Geddes
Assistant Federal Defender
Alaska Bar No. 8511157
601 West 5th Avenue, Suite 800
Anchorage, AK  99501
Ph:  (907) 646-3400
Fax:  (907) 646-3480
mary_geddes@fd.org

Certification:

I certify that on January 22, 2007, a copy of the foreground document, with attachments, was served electronically on:

Crandon Randell, Esq.

/s/ Mary C. Geddes