NELSON P. COHEN
United States Attorney

CRANDON RANDELL
Assistant U.S. Attorney
Federal Building & U.S. Courthouse
222 West Seventh Avenue, Room 253, #9
Anchorage, Alaska  99513-7567
Phone: (907) 271-5071
Fax: (907) 271-1500
Email: crandon.randell@usdoj.gov

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ALASKA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | Case 3:03-cr-034-JMF-JDR |
| | ) | |
| Plaintiff, | ) | **UNITED STATES'** |
| | ) | **SUPPLEMENTAL** |
| vs. | ) | **MEMORANDUM TO** |
| | ) | **MOTION PURSUANT TO** |
| AARON SHARPE, | ) | **28 U.S.C. §2255** |
| | ) | |
| Defendant. | ) | |
| | ) | |

COMES NOW the United States of America, by and through counsel, and submits this Supplemental Memorandum to defendant/petitioner Aaron Sharpe's motion to vacate, set aside or correct sentence pursuant to 28 U.S.C. §2255.

The government continues to rely on the Objections to this motion filed on July 31, 2006.

On December 11, 2006, an evidentiary hearing was conducted before the Honorable John D. Roberts, concerning "only one of Mr. Sharpe's claims, i.e., Mr. Bryson's failure to file a motion to suppress based upon an (sic) warrantless, unjustified search of Mr. Sharpe's trailer."[1] Defendant brief, pg. 2. This, then, is the clearly defined and sole remaining issue in this case. Under *Strickland*, has defendant shown that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." Strickland v. Washington, 104 S.Ct. 2052, 2069. What this means, in this case, is that trial counsel, the deceased and unavailable-for-comment Bill Bryson, Esq., was (1) "unprofessional" in <u>not</u> filing a suppression motion, and, further, <u>had</u> Bryson filed a suppression motion, he would have prevailed. So, it is a two part inquiry. Filing the motion is one thing, prevailing on the motion is another.[2]

**Factual Summary**

1. Four and ½ years ago, in August of 2002, criminal, Aaron Sharpe (defendant and petitioner) rents a mobile home in East Anchorage for the purpose of conducting a Criminal Enterprise – raising marijuana.

---

[1] William P. Bryson, prior to his death in January of 2006, was a long time and distinguished Anchorage defense attorney.

[2] Sharpe's primary witness, a local defense attorney named Robert Herz, opined that he would have filed a motion, but only this Court can determine the ultimate merit of the motion. This Court is fully aware that defense lawyers make their living filing motions.

2. Criminal, in order to hide his identity, and to avoid detection, takes precautions: he lies about his name, provides bogus application information including false telephone contact numbers, and changes the lock on the front door of his rental unit, contrary to the lease agreement.

3. Criminal screws up. There occurs, in the dead of winter, a serious water leak inside the rented mobile home which, as it drains out, attracts the notice of a neighbor. The concerned neighbor calls the property manager.

4. Property manager, paid to be responsible for the condition of the rental mobile home, attempts to contact tenant in order to address the issue of water gushing forth.  Tenant (criminal), because of phony telephone numbers supplied to management, is unreachable. Property manager attempts to gain entry with a key – a key that once upon a time fit the lock of the rental unit property. No luck with the key, the lock has been changed by criminal to keep management from discovering his Criminal Enterprise.

5. Property manager calls lawyer for mobile home park, who advises manager to gain entry, with the assistance of a locksmith. Property manager complies.

6. Property manager finally gains entry and discovers Criminal Enterprise – a marijuana grow – and a sheltering shotgun on a shelf by the front door. [There is

<u>no</u> evidence before the court that Property Manager is a law enforcement officer, or an agent acting for law enforcement.]  <u>Probable Cause now exists for obtaining a search warrant</u>. Now, it is only necessary to communicate the "probable cause" information to a law enforcement officer in order that the law enforcement officer can then visit a judicial official to obtain . . . a search warrant.

      7. Property manager calls the police. Police arrive. Property manager describes to police what he saw inside the mobile home.

      8. Police announce, "We're gonna have to get a warrant."

      9. Police verify Criminal Enterprise from the outside.[3]

      10. Police enter the mobile home in order to secure the shotgun, to secure the premises, and to investigate the water leak.[4]  Preliminary photographs are taken.

      11. The mobile home is then secured. An APD officer stands by to maintain security of the crime scene while a warrant is obtained.

      12. The Search Warrant is executed.

## Analysis

---

[3] Officer Kwasigroh testified that the front door of the crime scene was "wide open", that he could smell marijuana from outside, and that he could see inside the mobile home from the outside. He further testified that the two officers entered the structure to "assist the plumber."

[4] Officer Glor testified that he "had a concern about somebody being in there." According to him, walking through a crime scene, for security reasons, is routine procedure. He further stated that "drugs and guns together" were a "concern." Glor stated that he seized the shotgun and placed it in the trunk of his vehicle for "safety reasons."

**1**. **Was there actually a "search" prior to the obtaining of search warrant?**

The officers, prior to arriving at the scene, and certainly by the time they entered the mobile home <u>knew</u> the mobile home contained a marijuana grow, <u>knew</u> that it was a crime scene, <u>knew</u> it contained a shotgun, and, most importantly, <u>knew</u> that they were going to obtain a search warrant prior to any further investigation. The reason for the entry was <u>not</u> to take a peek, and <u>not</u> to get a preview. <u>Not</u> to cheat. There was no need to peek or cheat: the probable cause was on the table, it was in the bank. They went in to secure the crime scene, secure the shotgun, and to assist in dealing with the water leak. Nothing was gained from this entry, nothing obtained to provide, supply, or bolster probable cause to search. This entry, for Fourth Amendment purposes, was harmless beyond a reasonable doubt.

Contrast this situation with petitioner's cited cases on page 20 of his brief: in <u>Chapman v. United States</u>, 365 U.S. 610, 81 S. Ct. 776 (1961), two police officers, at the invitation of the landlord, entered a residence through a "bathroom window" <u>with no warrant</u> and discovered a "sizable distillery and 1,300 gallons of mash located in the living room." <u>Chapman</u>, 365 U.S. at 612. Unlike the case at bar, no discovery of contraband was made prior to the police going in through the window.

No warrant was obtained. No reason was advanced for the obtaining of no warrant, and the Supreme Court, therefore, found the search unlawful. Likewise in petitioner's cases of <u>Taylor v. United States</u>, 286 U.S. 1, 52 S.Ct. 466, 76 L.Ed. 951 (1932)(we could smell the whiskey), and <u>Johnson v. United States</u>, 333 U.S. 10, 68 S.Ct. 367, 92 L.Ed. 436 (1948)(we could smell the opium). No warrant.

Petitioner also cites the Ninth Circuit case of <u>United States v. Warner</u>, 843 F.2d 401 (9th Cir. 1988). In this case, a police officer, in a non emergency situation, accompanied by the landlord, entered a premises and seized items "from both the garage and the house." 843 F.2d at 403. In this case, the Court observed that there "was <u>no basis</u> for believing that any illicit activity was actually taking place on the premises; no occupants were present." *Id*. at 404 (emphasis supplied). Different from <u>our</u> case: here, the police knew, <u>prior to arrival</u>, there was "illicit activity . . . actually taking place on the premises." This is why the police proclaimed, "we're gonna have to get a warrant."

**2. Inevitable discovery**

Here, assuming the very worst, and concluding that the police, after being briefed as to the presence of a Criminal Enterprise (a marijuana farm) coupled with a protective firearm, should not have entered the crime scene to secure the shotgun, should not have entered the crime scene to make sure that other persons were not

present, and should not have entered the grow area to investigate the water leak, or, certainly, should not have taken preliminary photographs . . . where are we? [5]

We are at a point where we can legally conclude that the evidence inside the mobile home would have been discovered, inevitably, following the obtaining of the search warrant that was, in fact, obtained. The evidence is uncontroverted that the responding police determined – and decided – that they were going to obtain a search warrant before continuing with the investigation.

This case, and these facts, are neither subtle nor complex. This mobile home contained an illegal grow operation, plain and simple . . . there was no mystery, no surprise. These officers knew from minute one that they would need a search warrant, <u>said</u> they would need a warrant, and obtained one.

The inevitable discovery doctrine is an exception to the exclusionary rule. <u>Nix v. Williams</u>, 467 U.S. 431, 104 S.Ct. 2501, 81 L.Ed. 2d 377 (1984). For the exception to apply, the prosecution must show by a preponderance of the evidence that the contraband, or other material seized, would have been discovered inevitably by lawful means. *Id*. at 104 S.Ct. 2509; <u>United States v. Andrade</u>, 784

---

[5] It is always easy to second guess police conduct after the fact; it is a trifle more difficult to imagine what <u>we</u> would have done had we been standing at the crime scene in the same shoes at the time. For example, would <u>we</u>, assuming that we also dealt with crime scenes every day in our job, have waited to check the crime scene for the possible presence of person(s)? Would we have relied upon the conclusions of non law enforcement persons . . . persons we don't know and persons about whose judgment we are unfamiliar?  Would we have left the weapon in place, inside an obvious crime scene, not knowing how long it would take to obtain the warrant?

F.2d 1431, 1433 (9th Cir. 1986). [It is noteworthy, however, to observe that the inevitable discovery doctrine does not extend to a unexplained failure to secure a search warrant. <u>United States v. Echegoyen</u>, 799 F.2d 1271, 1280 n.7 (9th Cir. 1986); <u>United States v. Mejia</u>, 69 F.3d 309 (9th Cir. 1995).]

The Ninth Circuit has held that the "inevitable discovery doctrine applies only when the fact that makes discovery inevitable is born of circumstances other than those brought to light by the illegal search itself." <u>United States v. Reilly</u>, 224 F.3d 986, 995 (9th Cir. 2000).

Which is exactly what we have here: even assuming an "illegal search" the "circumstances" of discovery here were born with the entry by property management into a icicle encrusted mobile home leaking water and containing an illegal marijuana farm. The police, when this discovery was made, were absent and played no part in the discovery. They were summoned to the scene by property management, concerned about their rental unit being turned into a water hemorrhaging pot farm.

## Summary

William P. Bryson was an experienced defense attorney, admitted to practice in this state in May of 1973. Alaska Directory of Attorneys, Spring 1987. Bryson

was entirely aware of the significance of the shotgun perched on the shelf inside the front door of Sharpe' marijuana operation. Bryson made the tactical decision to call in an expert witness[6] to testify that the shotgun in question, and the ammunition it contained, were inadequate to defend a criminal enterprise such as that operated by Bryson's client, Mr. Sharpe. The expert testified that the ammunition was "dove-and-quail load, three-and-a-quarter-by-one, number 8." Which ammunition, when compared to different types of shotgun shot available, is "pretty small." Trial transcript, 3-64.[7] When asked what size ammunition he, the expert, would prefer "for personal or defense of property or for protection against bears, the expert replied, "I'd probably use slugs or double-aught buckshot." *Id*. at 3-65 (emphasis supplied).

Bryson, therefore, made the decision based upon the facts now known to all, to defend the case upon the improbability that the shotgun – and the ammunition inside – was adequate to have realistically been used to protect a marijuana grow operation, but, more likely, was present for no crime-related purpose.

Defendant/petitioner has failed to make out a case for "unprofessional

---

[6] Wayne Anthony Ross, a "director and former first vice-president" of the NRA. Trial transcript, 3-58.

[7] Ross testified that this size ammo would do fine "if you had a rabbit attack you or a dog or something like that." *Id*. at 3-66.

errors"on the part of his trial counsel likely to have led to a different result. This motion should be denied.

    RESPECTFULLY SUBMITTED this 26th day of February 2007, at Anchorage, Alaska.

    NELSON P. COHEN
    United States Attorney


     s/ Crandon Randell
    CRANDON RANDELL
    Assistant U.S. Attorney
    Federal Building & U.S. Courthouse
    222 West Seventh Avenue, #9, Room 253
    Anchorage, Alaska  99507
    Phone: (907) 271-5071
    Fax: (907) 271-1500
    E-mail: crandon.randell@usdoj.gov
    AK Bar # 8706044


**CERTIFICATE OF SERVICE**

I hereby certify that on June 5, 2006
a copy of the foregoing was served
electronically on Marry Geodes

s/ Crandon Randell